FILED
2006 Jun-29 PM 12:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | | |
|---|---|---|
| **STEVEN ALLAN FIKE, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CV 03-PT-2783-M** |
| | ) | |
| **JOHN EARL PEACE, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This cause comes on to be heard upon defendant General Shale Products, LLC's Motion for Summary Judgment, filed on October 14, 2005.

**FACTS[1] AND PROCEDURAL HISTORY**

On July 14, 2003, Steven Allan Fike ("Fike"), Billie Nadine Bigham ("Bigham"), Andrea Raiford Doxtator ("Doxtator"), April Gowen ("Gowen") - Doxtator's minor daughter, and two other minor children of Doxtator, not party to this suit, were driving in a 1997 Ford pickup truck on Alabama State Highway 35 in Cherokee County, Alabama. As traffic began backing up because of a slow vehicle, Fike, the driver of the truck, pulled into the left hand lane to pass. A tractor-trailer being driven by John Earl Peace ("Peace") pulled into the left lane at about the same time, behind the truck being driven by Fike. The brakes on the tractor-trailer failed to function properly, and the tractor-trailer began to pick up speed. Noticing that the tractor-trailer appeared to be out of control, Fike pulled his truck as far left off of the road as he

[1] The court notes where "facts" appear disputed.

could. Peace, not wanting to run his tractor-trailer off the road, attempted to squeeze through the gap made by Fike on the far left and the lane of slowed traffic on the right. The tractor-trailer's load was oversized, and Peace was unable to navigate the gap. The load struck Fike's truck on the right side, instantly killing Bigham, and injuring Gowen, Doxtator, and Fike, as well as destroying the pickup truck.

Defendant General Shale Products, LLC ("General Shale") is in the business of manufacturing brick. In the summer of 2003, General Shale hired Defendant DG Trucking to haul equipment from the General Shale plant in Kentucky to its new plant in Georgia. The cargo in question was large steel kiln cars used in the manufacture of brick. Due to the size of the kiln cars, they are considered to be an oversized load. General Shale, though a licensed motor carrier, generally does not haul oversized loads; DG Trucking is a licensed motor carrier that specializes in hauling such loads. General Shale has had a fifteen year relationship with DG Trucking, using them to haul oversize loads when necessary. There is no evidence that General Shale has ever had any problem with DG Trucking and its methods, safety history, or observation of legal requirements for a commercial motor carrier. At the time of the Fike accident, Peace was driving a DG Trucking tractor trailer loaded with General Shale's kiln cars. After the accident, an inspection of the tractor trailer by the Alabama State Troopers revealed several violations of the federal safety regulations applicable to motor carriers, including brakes that were out-of-adjustment.

On August 28, 2003, Fike, Bigham, Doxtator, and Doxtator as next friend of Gowen, filed suit against Peace, DG Trucking, and General Shale in the Circuit Court of Dekalb County, Alabama. In Count I of the Complaint, titled "Negligence, or Willful and Wanton Misconduct,"

the plaintiffs allege that Peace negligently, or willfully and wantonly, operated a tractor-trailer that was overloaded, without the required escort of a pilot vehicle, and attempted to navigate down the middle of the road, instead of risking injury to himself by pulling his own truck off the road. The plaintiffs further allege that DG Trucking negligently, or willfully and wantonly, entrusted the tractor trailer into the hands of Peace in a defective and substandard condition - not having been properly inspected and maintained. The plaintiffs also allege that both DG Trucking and General Shale were negligent or willful and wanton when they contracted with each other to haul the oversized load, that DG Trucking was negligent or willful and wanton in allowing Peace to drive an overloaded tractor trailer, and that General Shale breached its duty to operate in a safe manner when it "accepted without objection" goods that had been unsafely transported by DG Trucking.

In Count II of the Complaint, titled "Wrongful Death," the plaintiffs allege that the defendants' behavior resulted in the death of Billie Nadine Bigham. Fike, as administrator of the estate of Bigham, his mother, claims to bring the action pursuant to Alabama Code § 6-5-410 (1975). The plaintiffs demand money damages in an amount to be determined by a jury. On October 9, 2003, the defendants removed this action to the Northern District of Alabama, Middle Division, based on diversity jurisdiction as outlined in 28 U.S.C. § 1332.

**SUMMARY JUDGMENT STANDARD**

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS[2]

[2] This section summarizes the arguments made by the parties and does not necessarily reflect the conclusions reached by the court.

## I. Defendant General Shale's Motion.

### A. There is no evidence that General Shale was negligent in hiring DG Trucking to haul the kiln cars from Kentucky to Georgia.

According to General Shale, the plaintiffs' expert, Mr. Whitney Morgan ("Morgan"), states that General Shale failed to check information available on the Federal Motor Carrier Safety Administration's web site which shows that DG Trucking has out-of-service percentages for drivers and vehicles that exceeded the national average. General Shale claims that the assertion that this information shows negligent hiring on the part of General Shale is incorrect, because "virtually all" of this information pertains to the time period after the date General Shale hired DG Trucking. General Shale points out that Morgan agreed in deposition that he has no opinion or information about the condition or qualification of DG Trucking at the time that General Shale hired them. According to General Shale, the only evidence on this issue is the testimony of Mr. Bob Keys ("Keys"), a manager for General Shale. Keys testified that General Shale had been using DG Trucking occasionally for fifteen years, and had never experienced any problems with DG Trucking.

### B. General Shale did not have a legal duty to inspect the DG Trucking tractor or trailer or any other equipment used by DG Trucking.

General Shale claims that the undisputed evidence demonstrates that DG Trucking was an independent contractor and that the driver of the vehicle, Peace, was a DG Trucking employee. General Shale argues that there was no duty on General Shale to conduct an independent inspection of the tractor trailer at issue in this case. According to General Shale, Morgan's contention that General Shale was negligent for failing to identify that the tractor trailer's brakes were out of adjustment, that several tires were of insufficient tread depth, that the tractor trailer

did not have an annual inspection sticker, that the permit to haul the kiln cars had expired the day before the accident, and that DG Trucking was using only one escort vehicle when two are required, fails as a matter of law because General Shale had no legal duty to conduct an inspection of DG Trucking's equipment or its practices.

Although General Shale admits that it does occasionally operate tractor trailers and therefore is a carrier in certain contexts, General Shale claims that it was operating as a shipper in this case. *See Schramm v. Foster*, 341 F. Supp. 2d 536 (D. Md. 2004) (holding that "The focus of the court's inquiry must be on [defendant's] role in the specific transaction...."); *Phoenix Assur. Co. v. Kmart Corp.*, 977 F. Supp. 319, 326 (D.N.J. 1997) (registration as a broker and failure to register as a carrier are not dispositive of entity's true identity). According to General Shale, Morgan admits that General Shale was a shipper in the context of this case.

According to General Shale, it is well established in Alabama that "[t]he existence of a duty is a question of law to be determined by the trial judge." *New Addition Club, Inc. v. Vaughn*, 903 So. 2d 68, 73 (Ala. 2004); *Weissman v. Boating Magazine*, 946 F.2d 811, 814 (11th Cir. 1991) ("It is a question of law for the court to determine whether there is a duty of care owed by one party to another in a negligence action."). General Shale claims that, under Alabama law, "[a] negligence action cannot be maintained without a showing that the defendant owed the plaintiff a duty." *New Addition*, 903 So. 2d at 75; *Rose v. Miller & Co.*, 432 So. 2d 1237, 1238 (Ala. 1983).

General Shale claims that trucking companies such as DG Trucking are subject to regulation by the Federal Motor Carrier Safety Administration. General Shale cites 49 C.F.R. § 396.3 (2004): "Every motion carrier shall systematically inspect, repair, and maintain, or cause to

be systematically inspected, repaired, and maintained, all motor vehicles subject to its control." General Shale also claims that the driver of a motor vehicle is required to inspect the tractor trailer both before and after each trip. *See* 49 C.F.R. §§ 396.11, 396.13. According to General Shale, Morgan testified that General Shale had no duty to inspect in this case:

Q. So it's your testimony then that we are required to ask the driver for a copy of his permit?
Mr. Briskman: Objection. Mischaracterizes the testimony.
Q. No, we are not?
A. There's no requirement there.
Q. Correct. There's no requirement for us to do a pre-trip inspection?
A. Correct.
Q. There's no requirement for us to inspect the vehicle for annual inspections.
A. Correct

* * *

Q. But we don't have duty to go out and – and do those things? We should be familiar, but we don't have a duty to ask for a permit, to look for a sticker, to look at the tires and look at the brakes?
A. Well, you know, there's no requirement. Whether or not you have a duty, I think, will be under the purview of a jury to make that determination.

* * *

Q. And all I am saying is that although they are required to have knowledge --
A. Right.
Q. - - Of the regs --
A. Right.
Q. - - there is no duty or requirement placed on them placed by - - placed by the DOT regs, motor - - Federal Motor Carrier Safety Regulations for them to go out and independently verify any of those things?
A. That's fair.

Morgan Depo. at pp. 152-156.

General Shale also claims that Morgan testified that General Shale had no duty or responsibility to ensure that DG Trucking was using the correct number of escort vehicles required to transport the kiln cars:

Q. But again, although they could have asked, there's no duty on them or requirement on them under the regs for them to ask John Earl Peace, hey, how many escort vehicles do you have, is that the right number?

A. Well, that's fair, but the regs wouldn't address that.

Morgan Depo. at page 163.

According to General Shale, Morgan later testified that he is not aware if General Shale had the opportunity to inspect the tractor trailer and other equipment used by DG Trucking. *See* Morgan Depo. at pp. 134, 139, 161, 164.

General Shale claims that Morgan testified that the duty and obligation to inspect the tractor trailer, secure the kiln car, and obtain necessary permits and inspection stickers was on DG Trucking and its driver, Mr. Peace. According to Morgan:

Q. Do you know if General Shale secured the freight at issue in this case?
A. As I recall, that was the responsibility of the driver.

* * *

Q. Would the -- is it your understanding that the driver had the ultimate say and responsibility in how that load was physically placed on his trailer?
A. Well, I think generally speaking that's the custom and practice, yes.
Q. Is that true in this case?
A. I would believe so.

* * *

Q. But even after all of that is said and done … before the driver puts his tractor trailer on the road he needs to do his pretrip inspection?
A. Yes, sir.
Q. And so for everything that you are -- you are criticizing General Shale for, there is the intervening act on the part of John Earl Peace where he is supposed to do that?
A. Well, yes.
Q. The responsibility to get those inspections and stickers is on DG Trucking; right?
A. That's correct.

* * *

Q. Is there a -- the responsibility for ensuring that an appropriate permit -- the driver has an appropriate permit is on the driver, is it not?
A. Ultimately, yes. …

Morgan depo. at pp. 41-42, 60-61, 146.

According to General Shale, the few courts which have addressed this issue have held that a shipper is under no obligation or duty to inspect a car or vehicle furnished by a carrier. *See Thibodaux v. Southern Pacific Transport Co.*, 302 So. 2d 49, 52 (La. Ct. App. 1974) (holding that "[i]t is abundantly clear that the jurisprudence of this state squarely places the duty on the carrier to supply and furnish the shipper with a car suitable in every respect to meet its needs and requirements for the cargo to be shipped."); *A.J. Tebbe & Sons Co. v. Brown Express*, 341 S.W. 2d 642 (Tex. 1930). General Shale notes that this principle has also been recognized in American Jurisprudence, 13 Am. Jur. 2d Carriers § 243 (2005) which states "[t]here is no duty imposed upon a shipper to inspect a car or other vehicle furnished by a common carrier for the transportation of goods, except when the shipper has, by his or her own act or special contract, assumed responsibility for the selection of the vehicle." According to General Shale, it did not select the tractor trailer in this case and it "therefore had no duty to inspect the tractor trailer or other equipment used by DG Trucking."

General Shale asserts that Morgan agrees, "in very limited circumstances," that federal motor carrier regulations have limited application to shippers such as General Shale. According to General Shale, Morgan testified that the regulations apply only when hazardous materials are being shipped.[3] *See* Morgan depo. at pp. 20, 54. As it is undisputed that no hazardous materials were being shipped, General Shale reasons that "the fact that the federal motor carrier regulations place certain duties on shippers in the context of hazardous materials is indicative that in the

[3] The regulations pertaining to the shipment of hazardous materials are set forth in 49 C.F.R. § 397 (2004).

present context there is no such duty."

### C. Mr. Morgan's opinions are based on improper speculation

According to General Shale, the admissibility of expert testimony - whether based on "scientific," "technical," or "other specialized" knowledge - is governed by Federal Rule of Evidence 702 and the principles set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-592 (1993). Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

General Shale claims that the Supreme Court in *Daubert*, and more recently in *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999), emphasized the district court's "gatekeeping" function to ensure that expert testimony be both reliable and relevant. *Kumho Tire*, 526 U.S. at 141. According to General Shale, the fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Indeed, the gatekeeping role is designed "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. General Motors*, 141 F.3d 715, 720 (7th Cir. 1998).

General Shale claims that the district court's task as a gatekeeper is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in

reaching his conclusions. *Kumho Tire*, 526 U.S. at 153. "An expert opinion that is based on scientifically valid principles will satisfy Fed. R. Evid. 702; an expert's subjective belief or unsupported speculation will not." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997), *abrogation recognized on issue of standard of review*, *Morales v. American Honda Motor Co.*, 151 F.3d 600 (6th Cir. 1998). According to General Shale, the Supreme Court has cautioned:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

*General Electric v. Joiner*, 522 U.S. 136, 146 (1977).

General Shale claims that the party offering the expert testimony bears the burden of proof in establishing admissibility. *Daubert*, 509 U.S. at 592, n. 10.

General Shale notes that Morgan's opinion in this case is that General Shale failed to adequately instruct its employees regarding the motor carrier regulation. According to General Shale, Morgan "relies entirely on speculation by offering the opinion that had General Shale adequately instructed its employees regarding the...regulations, a General Shale employee would have noticed certain defects on the tractor or trailer." General Shale characterizes Morgan's concession that General Shale had no duty to inspect the tractor trailer, followed by his testimony that General Shale could have reviewed aspects of the vehicle, as "inconsistent."

General Shale claims that Morgan conceded that his testimony was based on speculation. *See* Morgan depo. at pp. 102, 145, 215, 277, 283. General Shale provides as an example:

> Q. You would agree with me that, do you not, that the tread in that
> -- in that tire may not have been readily observable --
> Mr. Briskman: Objection. Asked and answered.

A. It's possible.
Q. It's possible.
A. Right.
Q. I mean, we are speculating?
A. Right.

Morgan depo. at p. 145.

According to General Shale, "[a]lthough Mr. Morgan opines that a General Shale employee would have noticed brakes that were out of adjustment and 'bald' tires, he also conceded that it is entirely possible that the brakes were not out of adjustment and that it may not have been possible to see the 'bald' tires." Morgan depo. at pp. 99, 103.

Furthermore, General Shale asserts that Morgan concedes that he has no evidence that any General Shale employee had the opportunity to look at the tires or brakes, that it would be speculation to articulate General Shale's obligation to check the tires, and that he would not expect a General Shale employee to physically check the brakes on a semi. According to General Shale, Morgan's deposition testimony "reveals that his opinions in this case are based on improper speculations and guesswork." General Shale claims that it is therefore entitled to judgment as a matter of law.

**D. There is no evidence that the loading process was improper or contributed in any way to the accident at issue in this case.**

General Shale notes that Morgan testified that General Shale was in charge of the process of loading the kiln cars on DG Trucking's trailer. According to General Shale, the loading and securing of the cars is entirely irrelevant to this case, because there was no identifiable problem with the way in which the cars were loaded. Morgan testified:

Q. Mr. Morgan, what was the problem, if any, with the manner in which the kiln cars were loaded on trailer? Can you identify a problem in the loading process?

Mr. Briskman: Objection. Beyond the scope.
A. Not that I'm aware of.
Q. When that tractor trailer left General Shale's facility, are you aware of a single problem with the loading and / or securing of those kiln cars?
Mr. Briskman: Same objection
Mr. Bald: You asked him all kinds of questions about loading.
Mr. Briskman: Well, same objection.
A. Outside of the fact that he wasn't properly permitted to haul the load, nothing that I'm aware of.
Q. I mean, the loading process, the way the crane lifted up the kiln cars and placed them on the trailer and the way they were then secured by the driver, you can't identify a problem with that process?
A. I don't have enough - -
Mr. Briskman: Same objection.
A. I don't have enough information one way or the other.

Morgan depo. at pp. 266-67.

Furthermore, according to General Shale Morgan testified a number of times that the loading and securing of the load was ultimately the responsibility of the driver, Mr. Peace. Morgan depo. at pp. 41-42, 48, 50, 60-61, 116, 119-120. General Shale claims that there is no evidence that the loading or securing of the kiln cars was inappropriate or negligent and General Shale is entitled to judgment as a matter of law to the extent any such claim is made.

**E. There is no evidence that any act or omission by General Shale was the proximate cause of the accident at issue in this case.**

According to General Shale, the plaintiffs did not designate an expert to speak to the issue of causation. Though Morgan did address it briefly, General Shale claims that it is clear that he was speculating, as he testified that the alleged failure on the part of General Shale "may have contributed" to the cause of the accident. Morgan depo. at p. 140. Furthermore, General Shale notes that Morgan testified that the alleged failure of General Shale to verify that DG Trucking used the correct number of escort vehicles and had an appropriate permit were not the proximate

cause of the accident. General Shale asserts that not only do the plaintiffs fail to produce any evidence that any act or omission by General Shale was the proximate cause of the accident at issue, but also that General Shale's own expert testified that any opinion about the state of the tires or brakes while at General Shale's facility would be mere speculation.

**F. The undisputed evidence establishes that the cause of the accident was the improper operation of the tractor trailer by Mr. Peace.**

According to General Shale, a post-accident inspection of the tractor trailer revealed that it had numerous brakes that were out of adjustment. The investigation further revealed that the tractor trailer lost its braking power prior to the accident and the resultant inability to stop led to the accident. General Shale claims that Morgan testified that Peace, as driver of the truck, is required to perform a pre-trip inspection of the tractor trailer, but that he failed to do so. See Morgan depo. at pp. 70-72, 49 C.F.R. § 396.13 (2004).

General Shale claims that Morgan further testified that Peace failed to safely operate the tractor trailer and this failure was the proximate cause of the accident. Morgan testified:

Q. You would agree with me that John Earl Peace failed to operate his vehicle in a reasonable manner as he was cresting that hill and heading down?
A. Yes.
Q. And heading down the road. And that's -- are you -- would you agree with me that according to the -- I believe it's the -- the Uniform and Traffic Homicide report, that he -- John Earl Peace had some notice prior to the accident that his brakes were in poor condition?
A. It's my understanding.
Q. I believe there's a reference in there at some point to Mr. Peace stating that he smelled his brakes burning?
A. I believe so.
Q. The only proper thing for him to do at that point in time was to pull his vehicle over to the side of the road, correct, to stop it somewhere?

A. I think that's -- that's fair. I'm not sure the side of the road is the best possible place. But if he feels that's a problem, then I think that's fair.
Q. It's the only option available to him at that time, that what he has to do; right?
A. Yes, sir.
Q. … Did Mr. Peace apparently continue driving the vehicle after he noticed that his brakes -- that there seemed to be a problem with his brakes?
A. Apparently.

* * *

Q. So if Mr. Peace, after ascertaining that he appeared to have a problem with his brakes, continued driving?
A. It would appear so.
Q. And that is obviously improper?
A. I would think that's fair, yes.

Morgan depo. at pp. 110-113.

General Shale further claims that Morgan testified that Peace was improperly operating the tractor trailer at the time of the accident by either driving too fast or not maintaining an adequate distance from other vehicles to allow himself time to brake. Morgan depo. at p. 166. According to General Shale, Morgan was unable to identify anything other than Peace's improper operation of the tractor trailer as the proximate cause of the accident. Morgan depo. at p. 200.

**G. John Peace's negligence constitutes an intervening and superseding cause of the accident at issue.**

According to General Shale, the undisputed evidence in this case shows that Peace failed to comply with the motor carrier safety regulations by not performing a pre-trip inspection and by operating his vehicle in an unsafe manner. Morgan depo. at pp. 71-72, 110-113, 166. General Shale notes that the Alabama Supreme Court summarized the doctrine of intervening cause in *General Motors Corp. v. Edwards*, 482 So. 2d 1176 (Ala. 1985):

> Loosely defined, an "intervening cause" is one which occurs after an act committed by a tortfeasor and which relieves him of his

> liability by breaking the chain of causation between his act and the resulting injury. *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338 (Ala. 1976). This Court has stated:
> "However negligent a person may have been in some particular, he is liable only to those who may have been injured by reason of such negligence, as the proximate cause. Where some independent agency has intervened and been the immediate cause of the injury, the party guilty of negligence in the first instance is not responsible." *Mobile City Lines, Inc. v. Proctor*, 130 So. 2d 388 (Ala. 1961).
> An intervening cause may be an "act of God," such as an extraordinary event of nature, *Bradford v. Stanley*, 355 So. 2d 328 (Ala. 1978), or the actions of another, usually, though not necessarily, another tortfeasor; however, a cause is not an intervening cause, so as to relieve a tortfeasor of his liability, unless it comes into active operation after the tortfeasor has acted. Prosser & Keeton on Torts, *supra*, at 301. In other words, it must occur between the act of the tortfeasor and the injury sustained for the chain of causation between the act and the injury to be broken. *Vines*, *supra*; *Aplin v. Dean*, 164 So. 737 (Ala. 1935).
> Not every cause which comes into operation after a tortfeasor has acted will relieve him of liability for his wrongful act. More than the proper temporal relationship between the tortfeasor's act and the subsequent cause is required. In order to be an intervening cause, a subsequent cause also must have been unforeseeable and must have been sufficient in and of itself to have been the sole "cause in fact" of the injury. *Vines*, *supra*, at 1339.

*General Motors Corp. v. Edwards*, 482 So. 2d at 1194-1195 (overruled on other grounds by *Schwartz v. Volvo North America Corp.*, 554 So. 2d 927 (Ala. 1989)).

Morgan further testified as to an intervening cause:

> Q. But even after all of that is said and done . . . before the driver puts his tractor trailer on the road he needs to do his pretrip inspection?
> A. Yes, sir.
> Q. And so everything that you are -- you are criticizing General Shale for, there is the intervening act on the part of John Earl Peace where he is supposed to do that?
> A. Well, yes.

Morgan deposition at p. 141.

General Shale claims that Morgan testified that the evidence indicates that Peace continued to

drive the tractor trailer after discovering that his brakes were beginning to fail. Morgan depo. at pp. 110-113, 200.

According to General Shale, the Alabama Supreme Court found that an intervening cause existed as a matter of law in a similar context in the case of *Pugh v. Taylor*, 507 So. 2d 428 (Ala. 1987). In *Pugh*, the defendant was driving his oversize vehicle without the warning devices required by Alabama law. As the plaintiff approached the defendant's vehicle from the other direction, the plaintiff's brakes failed, causing him to veer in to the defendant's vehicle. The plaintiff argued that the defendant's failure to get a permit for and place warning devices on his oversized vehicle caused the accident. The Alabama Supreme Court disagreed, stating that "under the facts of this case, no reasonable factfinder could conclude that the failure of [the defendant] to get a permit and place warning devices on [his vehicle] to warn approaching motorists of his oversized vehicle...proximately caused the accident." *Id*. at 432. The Court concluded that the plaintiff's own negligence barred his recovery from the defendant. *Id*.

General Shale argues that, as was the case in *Pugh*, the negligent operation of the tractor trailer by Peace was the proximate cause of the accident. General Shale claims that, even assuming any negligence on the part of General Shale, the negligence of Peace was an intervening event which breaks the chain of causation.

**H. General Shale is not liable under a theory that it aided or abetted any violation of the Motor Carrier Safety Regulations.**

General Shale claims that the plaintiffs contend that General Shale aided or abetted a violation of the Motor Carrier Safety Regulations in violation of 49 CFR § 390.13. Section 390.13 states: "No person shall aid, abet, encourage or require a motor carrier or its employees to

violate the rules of this chapter." According to General Shale, Morgan testified that General Shale aided and abetted DG Trucking due to "[i]ts failure to have the safety management controls in place to make sure your employees are properly instructed...in the applicable regulations and even know what they – the kind of things they need to be looking for." Morgan depo. at p. 188. General Shale argues that Morgan "mischaracterizes" § 390.13 and, "moreover, his deposition testimony supports the conclusion that General Shale did not aid, abet, encourage or require DG Trucking to violate the regulations."

According to General Shale, only the United States District Court for the District of Maryland has applied or interpreted this regulation. In *Schramm v. Foster*, 341 F. Supp. 2d 536, 550-551 (D. Md. 2004), the court held that a defendant must have "knowingly associated himself with and participated in the criminal venture." In *Schramm*, the plaintiff accused the defendant of aiding and abetting the carrier by failing to inquire into the driver's available hours and prescribing a pick up and delivery time that would require him to drive in excess of his available hours. General Shale claims that "[t]he court held, however, that there was no evidence that the defendant intended to assist the driver in violating the hours of service regulation and that it was insufficient to simply allege that the defendant 'brought about the arrangement that made it possible' for the carrier and driver to violate the regulations." *Id*. at 551.

General Shale argues that the *Schramm* holding is consistent with the plain language of 49 CFR § 390.13, relying on the Webster's dictionary definitions of the terms "aid," "abet," "encourage," and "require." According to General Shale:

> "Aid" is defined by Webster's dictionary as "to give assistance";
> "Abet" is defined as "to actively second and encourage";
> "Encourage" is defined as "to give help or patronage to"; and

> "Require" is defined as "to impose a compulsion or command on". Merriam Webster's Collegiate Dictionary 24, 2, 381, 995 (10th ed. 1993).

General Shale claims that there is no evidence that General Shale knowingly assisted, abetted, encouraged, or required DG Trucking to violate the safety regulations. According to General Shale, Morgan testified that he is not aware of General Shale's asking, requesting, requiring, or encouraging DG Trucking to commit any violation. Morgan depo. at pp. 216-218. General Shale further notes that Morgan admitted that he has seen no evidence that General Shale possessed any information as to any specific problems with the tractor trailer, or that General Shale affirmatively aided, abetted, or encouraged DG Trucking to violate any regulations. Morgan depo. at pp. 227-228.

**II. Plaintiffs Fike and Doxtator-Fike's Response to Defendant General Shale's Motion.**

According to Fike and Doxtator-Fike (hereinafter "the Fikes"), General Shale's employees loaded the kiln cars onto the trailer driven by Peace. The Fikes claim that General Shale had considered shipping the kiln cars by rail, but the load was too large to fit through the railroad tunnel between Corbin, Kentucky and Knoxville, Tennessee. The Fikes further claim that "[a]s of March 24, 2003, four months prior to the accident made the basis of this action, DG Trucking had a safety evaluation, as noticed on safety stat, of which a rating of 75 or greater is considered deficient. Therefore, DG Trucking had a deficient rating in all areas, including Driver, Vehicle, and Safety Management." Morgan affidavit at p. 2. The Fikes argue that the Federal Motor Carrier Safety Regulations are not intended to preclude actions based in state law, quoting § 390.9:

> Except as otherwise specifically indicated, Subchapter B of this chapter is not intended to preclude States or subdivisions thereof from

> establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations by the person subject thereto.

**A. Negligence**

According to the Fikes, Alabama law defines negligence as "the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something that a reasonably prudent person would not have done under the same or similar circumstances." *Ford Motor Co. v. Burdenshaw*, 661 So. 2d 236, 238 (Ala. 1991). In order to establish a cause of action for negligence, the plaintiff must prove the following elements: "(1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's negligence was the actual and proximate cause of that loss or injury." *Id*. The Fikes note that the Alabama Court of Civil Appeals has held:

> [T]he presence or absence of negligence is generally a question for a jury to determine; thus, a summary judgment is rarely appropriate in a negligence case. *Beddingfield v. Central Bank of Alabama, N.A.*, 440 So. 2d 1051, 1053 (Ala. 1983). Findings on issues of negligence and contributory negligence turn on the unique facts of each case, *Lowe's Home Centers, Inc., v. Laxson*, 655 So. 2d 943, 945 (Ala. 1994), and should not ordinarily be disposed of by the trial court in a peremptory manner. *Brown v. AAA Wood Products, Inc.*, 380 So. 2d 784, 787 (Ala. 1980). Likewise, the existence of proximate cause is usually an issue to be resolved by a jury. *Davison v. Mobile Infirmary*, 456 So. 2d 14, 24 (Ala. 1984). Where the evidence is such that fair-minded persons, in the exercise of impartial judgment, could differ in their finding as to whether there existed negligence that caused injury, the case should be submitted to a jury to determine legal liability. *Lowe's*, *supra*, at 945-46.

*B. C. Curry v. Welborn Transport*, 678 So.2d 158, 161 (Ala.1996).

**1. Liability for the actions of an independent contractor.**

Though the Fikes concede that, as a general rule, a principal is insulated from liability for the actions of its general contractor, they claim that this rule has numerous exceptions:

> The general rule in this state, and in most others, is that: ...one is not ordinarily responsible for the negligent acts of his independent contractor. But this rule, as most others, has important exceptions. One is that a person is responsible for the manner of the performance of his non delegable duties, though done by an independent contractor, and therefore, that one who by his contract or by law is due certain obligations to another cannot divest himself of liability for a negligent performance by reason of the employment of such contractor. . .
> It is also generally recognized that one who employs a contractor to carry on an inherently dangerous activity cannot thereby insulate himself from liability.

*Boroughs v. Joiner*, 337 So. 2d 340, 342 (Ala. 1976) (internal citations omitted).

The Fikes argue that both the non delegable duty and the inherently dangerous activity exceptions to the general rule apply in the instant case.

**a. Inherently or intrinsically dangerous activity and abnormally dangerous work.**

The Fikes rely on the Restatement (Second) of Torts §416 (1965) for an articulation of the inherently dangerous work exception to the general rule:

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such cautions in the contract or otherwise.

The Fikes recognize that there exists a distinction between engaging in inherently dangerous activity and "ultra-hazardous activity;" the inherently dangerous exception applies only where negligence exists. The Fikes cite the Alabama Supreme Court:

> We hold that aerial application of insecticides and pesticides falls into

> the intrinsically or inherently dangerous category and therefore, the landowner cannot insulate himself from liability simply because he has caused the application of the product to be made on his land by an independent contractor. In so holding, we do not adopt the view, as some courts have done, that such activity is ultra hazardous thereby rendering one strictly liable, notwithstanding his exercise of the utmost care... The test of liability on the part of the landowner is one of reasonableness. Liability is not absolute but is imposed on the landowner for his failure to exercise due care in a situation in which the work being performed is sufficiently dangerous that the landowner himself has a duty to third persons who may sustain injury or damage from the work unless proper precautions are taken in the performance thereof.

*Boroughs v. Joiner*, 337 So. 2d 340, 343 (Ala. 1976).

According to the Fikes, "**the hauling of the 6 kiln cars** overloaded the trailer, exceeded the width allowed by law and **constituted an inherently dangerous activity**." (emphasis added).

In the *Boroughs* case, the Alabama Supreme court discussed what makes an activity inherently or intrinsically dangerous:

> It is also generally recognized that one who employs a contractor to carry on an inherently or intrinsically dangerous activity cannot thereby insulate himself from liability . . . Although the courts have had some difficulty in stating a precise definition of activity which is inherently or intrinsically dangerous, the cases seem to agree that an intrinsic danger in an undertaking . . . is one which inheres in the performance of the contract and results directly from the work to be done, not from the collateral negligence of the contractor, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it.
> The rule is stated in Restatement of the Law, Torts 2d, Vol. 2, §427 (1965), as follows:
>
> > One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

*Boroughs*, 337 So. 2d at 342.

According to the Fikes, in the case of *Williams v. Tennessee River Pulp and Paper Co.*, 442 So. 2d 20 (Ala. 1983), the Alabama Supreme Court observed that, though no Alabama case had formally adopted § 416 of the Restatement (Second) of Torts:

> . . . we have adopted its general principles in an earlier case. An exception . . . obtains where a duty to the public exists in the manner of executing the work undertaken by the contractor. Such duty exists when the execution of the work tends to create a nuisance; when it is dangerous within itself, as in blasting operations; when the work requires the creation of dangerous conditions, such as ditches and the like in a public highway; or generally when *the maintenance of safe conditions in connection with the work is essential to protect of the public*. In such case the chief contractor cannot transfer his public duty in the hands of another, to that extent, that other is in law the mere agent and the contractor is liable for his negligence.

*Id.* at 23, n. 2. (Emphasis in original.)

The Fikes conclude that the transportation of the kiln cars at issue was intrinsically and inherently dangerous. In support of this conclusion, the Fikes rely upon General Shale's expert witness Terry E. Morgan[4], who testified:

> Q. Bob asked you some questions there about the fact of trucking and hauling freight can be dangerous; do you remember that?
> A. Yes, I do.
> Q. And trucking, in general, can be dangerous?
> A. Yes, it can. It's one of the most dangerous industries.
>
> ***
>
> Q. Yes. But what they did is, they went around Knoxville, they went around these large cities, and then they come through the back roads of Alabama and put this load on a highway that's 24 feet wide. That is inherently dangerous, is it not?
> A. It would be inherently dangerous for the trucker to do that, yes.

Terry Morgan depo. at pp. 108, 95.

The Fikes argue that liability rests on General Shale because this transportation was an

---

[4]This Mr. Terry E. Morgan is not to be confused with the Fikes' own expert witness, Mr. Whitney Morgan.

intrinsically and inherently dangerous activity.

**b. Non Delegable Duty**

According to the Fikes, the Alabama Supreme Court considered the general rule regarding the liability of an employer for an independent contractor, and the exceptions to that rule:

> Relying on the general rule than an employer is not ordinarily liable for the tortious acts committed by an independent contractor, the defendant insists it was not liable in this case for the wrongful manner in which plaintiff's truck was repossessed. The general rule urged by the defendant is well settled. 41 Am. Jur. 2d Independent Contractors, § 24 (1968); Restatement (Second) of Torts §409 (1965). But this rule has important exceptions. One is that an employer is responsible for the manner of performance of certain non-delegable duties, though done by an independent contractor. An employer who by contract or law owes a specific duty to another cannot escape liability for a tortious performance by reason of the employment of an independent contractor. *Alabama Power Co. v. Pierre*, 183 So. 665 (1938); *State Farm Mut. Auto Ins. Co. v. Dodd*, 162 So. 2d 621 (1964); *Robertson v. City of Tuscaloosa*, 413 So. 2d 1064 (Ala. 1982); 41 Am. Jur. 2d Independent Contractors §38 (1968).

*General Finance Corp. v. Smith*, 505 So. 2d 1045, 1047 (Ala. 1987).

The Fikes claim that they will show that General Shale has duties pursuant both to statutes and to contracts that prevent General Shale's escaping liability.

**I. Statutory Duty**

Alabama Code § 32-9-20(1) provides in pertinent part:

> Width. Vehicles and combinations of vehicles, operating on highways with traffic lanes 12 feet or more in width, shall not exceed a total outside width, including any load thereon, of 102 inches...

Ala Code § 32-9-20(1) (1975).

The Fikes note that the load in question was 212 inches in width, more than double the width allowed by law. Alabama Code § 32-9-20(4) provides in pertinent part:

> It shall be unlawful for any person to drive on any highway in this state any vehicle or vehicles of a size or weight except in accordance with the following... No vehicle or combination of vehicles shall be permitted to operate on any portion of the Interstate Highway System of Alabama that shall have a greater weight than 20,000 pounds carried on any one axle...

Ala Code § 32-9-20(4) (1975).

The Fikes claims that, while the vehicle at issue weighed in at 81,900 pounds, well below the 88,000 pound maximum contemplated by the statute, that statute contemplates that the truck in question would be fit for the purpose of carrying such a load. Additionally, the Fikes note, the truck was traveling not on the Interstate Highway System, but rather a state highway with a width of 23 feet.

The Fikes argue that Section 32-9-20 exists to prevent overweight and extra-wide loads from injuring members of the general public. They cite both *Curry v. State*, 506 So. 2d 346 (Ala. Crim. App. 1986) and *Heathcock v. State*, 415 So. 2d 1198 (Ala. Crim. App. 1982) in support of this assertion. The Fikes conclude that the imposition of criminal liability as in these two cases signifies that Section 32-9-20 imposes a non delegable duty upon General Shale.

According to the Fikes, a non delegable duty can arise either by statute or common law. *See Borden v. Consumer Warehouse Foods*, 601 So. 2d 976 (Ala. 1992); *General Finance Corp. v. Smith*, 505 So. 2d 1045 (Ala. 1987); *Montgomery St. Ry. Co. v. Smith*, 39 So. 757 (Ala. 1905); *Walter L. Couse & Co. v. The Hardy Corp.*, 274 So. 2d 316, 321 (1972). The Fikes claim that General Shale owed a duty to the public to prevent trucks overloaded with its products from driving on the highways, and it cannot now escape liability for that overloading by committing the work to an independent contractor. According to the Fikes, General Shale knew that transporting these kiln cars would create a dangerous condition on the public highway and

therefore hired DG Trucking to transport them.

**ii. Contractual Duty**

The Fikes claim that General Shale had, in addition to a non delegable statutory duty with respect to the transportation of the kiln cars, a non delegable contractual duty. The Fikes claim that, according to General Shale, the agreement between General Shale and DG Trucking was the following:

> DG Trucking and Equipment Sales, Incorporated was responsible for hauling all the kiln cars from Corbin, Kentucky to Coosa, Georgia their destination, by way of a bill of lading and invoice. The business was transacted in this manner due to the long term relationship between the parties.

According to the Fikes, the Alabama Supreme Court has discussed the issue of non delegable contractual duties on several occasions. In the case of *State Farm Mut. Auto. Inc. Co. v. Dodd*, 162 So. 2d 621 (Ala. 1964), the plaintiff claimed that his son was killed in automobile accident caused by negligently-performed automobile repairs done by an independent shop pursuant to an insurance contract the son had with State Farm. Though State Farm claimed that it was not liable because the shop was an independent contractor, the Alabama Supreme Court stated:

> The general rule is well settled that one is not ordinarily responsible for the negligent acts of his independent contractor. But this rule, as most others, has important exceptions. One is that a person is responsible for the manner of the performance of his nondelegable duties, though done by an independent contractor, and therefore, that one who by his contract or by law is due certain obligations to another cannot divest himself of liability for a negligent performance by reason of the employment of such contractor... It seems to us, then, that if State Farm elected to repair the automobile, then its duty to do so became a contractual duty and it was bound to use due care in making the repairs, for when the contract does not in terms require reasonable care in doing the act stipulated to be done, *the law imposes a duty*- but does not imply a contract- *to exercise due care in doing the act*: and, therefore, when negligence exists in

> doing that act an action in tort only is available...

*State Farm*, 162 So. 2d at 626. (Emphasis in original.)

**2. Negligent Hiring of an Incompetent Contractor**

According to the Fikes, 41 Am. Jur. 2d, *Independent Contractors* § 37 explains in pertinent part:

> An exception to the general rule of nonliability of an employer for the negligent acts of an independent contractor is recognized where the employer has failed to exercise due care to secure a competent contractor for the work, and if lack of such care is found, the employer may be liable for the negligent acts of the contractor. For the employer to be held liable on the ground of having employed an incompetent or otherwise unsuitable contractor, it must be demonstrated that the employer either knew or by the exercise of reasonable care might have ascertained, that the contractor was not properly qualified to undertake the work.

The Fikes further cite the Restatement (Second) of Torts § 411 (1965):

> An employer is subject to liability for physical harm to a third person caused by his failure to exercise reasonable care to employ a competent and careful contractor
>
> (a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
>
> (b) to perform any duty which the employer owes to third persons.

The Fikes claim that it is clear that the work in this case involved a high risk of physical harm unless it was performed skillfully and carefully.

**a. General Shale Failed to Exercise Due Care to Secure a Competent Contractor**

According to the Fikes, the Restatement (Second) of Torts §411 (1965) states the meaning of "competent and careful contractor" as follows:

> The words "competent and careful contractor" denote a contractor who possesses the knowledge, skill, experience, and available equipment

> which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary.

The Restatement (Second) of Torts §411 further states that the factors that determine the amount of care required include:

> (1) the danger to which others will be exposed if the contractor's work is not properly done; (2) the character of the work to be done – whether the work lies within the competence of the average man or is work which can be properly done only by persons possessing special skill and training; and (3) the existence of a relation between the parties which imposes upon the one a peculiar duty of protecting the other.
>
> . . .
>
> If the work is such as will be highly dangerous unless properly done and is of a sort which requires peculiar competence and skill for its successful accomplishment, one who employs a contractor to do such work may well be required to go to considerable pains to investigate the reputation of the contractor and, if the work is peculiarly dangerous unless carefully done, to go further and ascertain the contractor's actual competence.

The Fikes claim that the loading of these kiln cars were outside the competence of the average man. According to the Fikes, "[i]f this work could be performed successfully by the average man, then General Shale would have transported this material 'in-house,' however, they chose DG Trucking." The Fikes argue that General Shale, as a common carrier, was aware of the dangers involved, and had the duty to ascertain the DG Trucking's actual competence.

**b. General Shale Knew, or by the Exercise of Reasonable Care, Might Have Ascertained, that the Contractor Was Not Properly Qualified to Undertake the Work.**

According to the Fikes, the only criteria upon which General Shale relied when selecting DG Trucking was that they had a fifteen-year business relationship. The Fikes claim that General Shale did not inquire into the safety of the vehicle, the competence of the driver or the legality of

the load. Rather, General Shale just assumed that DG Trucking was competent. The Fikes further claim that General Shale should have known that each of the sixteen loads of kiln cars, and not just the one resulting in an accident, was illegal and hazardous. According to the Fikes, Peace had several speeding tickets and other criminal offenses listed in his driving and background history; this coupled with the defective status of the tractor trailer provides ample evidence for a jury to hold General Shale liable for DG Trucking's negligence.

According to the Fikes, the Ninth Circuit Court of Appeals, in *L.B. Foster Co. v. Hurnblad*, 418 F.2d 727, 731 (9th Cir. 1969), using the same standard as used in Alabama, found that the contractor's official had not inquired as to whether the independent contractor was a licensed carrier, or where it maintained its base of operations, or what kind of equipment it would utilize. The court found:

> In light of [contractors] experience in shipping similar loads, of the highway danger posed by the size of this load, and of the knowledge and actions of [company's] employee in contracting with [independent contractor] we conclude that the evidence warranted a jury finding that [contractor] failed to make a reasonable inquiry as to [independent contractor's] competence in supply safe highway equipment.

The Fikes argue that General Shale showed a complete indifference as to how DG Trucking transported and delivered the kiln cars.

The Fikes claim that General Shale not only negligently hired DG Trucking, but it also "openly and wilfully participated in the hazardous activities of DG Trucking." The Fikes point out that four months prior to the accident, DG Trucking had a safestat score considered deficient by the FMCSA. According to the Fikes, this information was readily available to General Shale.

**3. Negligent Loading of the Kiln Cars by General Shale**

In *Birmingham Slag Division of Vulcan Materials v. Chandler*, 231 So. 2d 329 (Ala. Civ. App. 1970), the Alabama Court of Civil Appeals dealt with the issue of negligently loading a truck. The court held:

> Every action in tort consists of three elements: (1) the existence of a legal duty by defendant to plaintiff; (2) a breach of that duty; (3) damages as the proximate result. ..The complaint...charged defendant with negligently overloading trucks which were traveling the road so that the slag fell off in large quantities. It is axiomatic that the public is entitled to the unobstructed use of its highways and roads, and broadly speaking, is entitled to have such way in the condition in which it was originally placed. Whoever, without proper authorization negligently materially obstructs it, renders its use hazardous, or materially contributes or participates in the doing of something which renders its use hazardous, violates the right of the public...The fact of who actually owned the material at the time it fell in the highway has nothing to do with the negligent loading, which is the point at which a duty arises. In the instant case, the evidence disclosed that slag had fallen, from trucks loaded at the appellant's plant, at the scene of the accident over a long period of time, and in such quantities that members of the public loaded it and hauled it away. Appellant knew, or should have known, with reasonable diligence, that such spillage was occurring and that it was due, at least in part, to the overloading of the trucks. Thus, we believe, that if appellant in loading the trucks, acting as a reasonable person, was able to foresee an unreasonable risk of harm to the plaintiff, or one in plaintiff's situation, as a result of slag falling from trucks onto the highway, caused by his overloading them, appellant would be negligent and liable in damages to the person injured as a proximate result of such negligence.

*Id.* at 334.

According to the Fikes, General Shale had knowledge that the load was hazardous and illegal. The Fikes argue that "[e]ven if this court accepts the Defendant's argument that they did not know this load was hazardous or illegal due to the expired permit, these Defendant's [sic] are charged with the duty to investigate, inquire and research their independent contractors." *See Black Belt Wood Co. v. Sessions*, 514 So. 2d 1249 (Ala. 1987); *Vines v. Plantation Motor Lodge*,

336 So. 2d 1338 (Ala. 1976).

According to the Fikes, General Shale, being an ICC carrier, was charged with the knowledge that these loads were illegal and hazardous. They claim that General Shale used its own crane to lift each kiln car onto the trailer. Furthermore, the Fikes assert that General Shale issued a bill of lading to DG Trucking calling for a maximum load of 20 tons involved in the shipment. The Fikes argue that General Shale, or any reasonable person, should have been able to recognize the hazard they were putting on the road.

**B. Expert Testimony**

The Fikes note that the Eleventh Circuit did an in-depth review of the requirements in considering expert testimony and the "gatekeeping function" of the district courts in *U.S. v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). They cite the following excerpts:

> The starting point for our analysis is Rule 702 of the Federal Rules of Evidence which controls the admission of expert testimony. It provides:
>
> > If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> As the Supreme Court made abundantly clear in *Daubert* Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the admissibility of expert scientific evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. at 589n. 7, 597, 113 S. Ct. at 2795 n.7, 2798. The trial courts are also required to play the same gatekeeping function considering the admissibility of technical expert evidence. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. at 147, 119 S. Ct. at 1174.

*Frazier* at 1259-1260.

Also:

> Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702 we engage in a rigorous three-part inquiry. Trial courts must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems*, Inc., 158 F.3d 548, 562 (citing *Daubert* 509 U.S. at 589, 113 S. Ct. at 2794).

*Id.*

**1. Whitney Morgan is Qualified to Testify Competently Regarding the Matters He Intends to Address**

According to the Fikes, Whitney Morgan has thirty years of experience working in the trucking and regulatory industry, including 7 years of employment with the U.S. Department of Transportation, Federal Highway Administration, and Bureau of Motor Carrier Safety which included ongoing responsibility for personally administering the Federal Motor Carrier Safety Program in the State of Alabama. Additionally, he has spent numerous years employed for other similar agencies. The Fikes note that this qualifies him as an expert witness, though this contention was never disputed by any other parties.

**2. The Methodology by Which Morgan Reached His Conclusions is Sufficiently Reliable.**

The Fikes, after listing the volumes of data to which Morgan referred in reaching his conclusions, claim that Morgan's methodology is at least as reliable as that of General Shale's witness, Terry Morgan, whom they allege referred to a much smaller amount of information in reaching his conclusions.

The Fikes note that General Shale attacks Morgan's opinions on the ground that they are allegedly based on improper speculation. In rebuttal of this, the Fikes respond:

1. Morgan's opinion that General Shale is a motor carrier and is therefore required to be knowledgeable of all applicable FMCSR's is based upon undisputed fact and the regulations themselves.
2. Morgan's opinion that General Shale is required to have instructed their employees in the applicable safety regulations is based upon the FMCSR.
3. Morgan's opinion that General Shale failed to provide said instruction to their employees is based upon deposition testimony taken from General Shale's employees.
4. Morgan's opinion, with a reasonable degree of probability in the field of commercial motor vehicle compliance, enforcement and safety, that General Shale aided and/or abetted DG Trucking and their driver John Peace is based upon the facts of this case, the application of FMCSR 390.13 and the fact that General Shale was not the carrier of this load.

The Fikes claim that Morgan also offers opinions related to general safety and practices. They claim that these opinions support their claims of negligence under state law, which are not excused by the application or non-application of the Federal Motor Carrier Safety Regulations. According to the Fikes, General Shale generalizes Morgan's comments and takes them out of context, though they acknowledge that Morgan conceded that the FMCSR did not place a duty on General Shale to inspect the truck. The Fikes assert "General Shale cannot complain that Morgan's testimony is speculative, when a majority of the questions asked of Morgan in his deposition called for speculation, assumed facts not known and asked him to assume that certain conditions were present. Such questions resulted in answers of 'its's possible,' 'generally,' and 'typically.'"

**2. The Testimony of Whitney Morgan Would Assist the Trier of Fact**

According to the Fikes, Morgan's testimony will assist the trier of fact in interpreting and applying the Federal Motor Carrier Safety Regulations, understand the general practices of

commercial truckers, and understand the necessary safety procedures in that industry.

**C. General Shale is Liable Under the Theory That It Aided and Abetted DG Trucking in Violating the Motor Carrier Safety Regulations.**

According to the Fikes, General Shale failed to address the "knowledge" prong of an aiding and abetting analysis. The Fikes reference the following definition of "knowingly":

> Knowingly. With knowledge; consciously, intelligently; willfully; intentionally.
> A person acts knowingly with respect to a material element of an offense when: (I) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exits; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

Model Penal Code, § 2.202.

The Fikes claim that knowledge can be shown through circumstantial evidence or reckless conduct. *See In re Sahlen & Associates*, 773 F. Supp. 342 (S.D. Fla. 1991); *Becks v. Emery-Richardson, Inc.*, 1990 WL 303548 (S.D. Fla. 1990); *Atlantic Coast Line Ry. Co. v. Anderson*, 267 F.2d 329 (5th Cir. 1959). According to the Fikes, an application of this case law to this case makes it clear that General Shale, as a common carrier with knowledge of both the industry and the Motor Carrier Regulations, knowingly aided and abetted DG Trucking in violating the FMCSR.

**D. The Injuries Sustained By Plaintiffs Were the Proximate Cause of the Negligence of General Shale, and the Actions of Peace Were Not an Intervening or Superseding Cause**

The Fikes assert "[i]t is well established that the question of proximate cause is almost always a question of fact to be determined by the jury and the question must go to the jury if reasonable inferences from the evidence support plaintiff's claim." *See Ledmond Constr. Co. v.*

*Wheeler*, 669 So. 2d 855, 862 (Ala. 1995); *Tuscaloosa County v. Barnett*, 562 So. 2d 166, 169 (Ala. 1990); *Cain v. Sheraton Perimeter Park South Hotel*, 592 So. 2d 218, 221 (Ala. 1991). The Fikes refer to the following by the Alabama Court of Civil Appeals:

> The general rule of proximate causation in Alabama is that a negligent act or omission is the **proximate cause of an injury if the injury is "a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury."** ***Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976). Further, "[a] foreseeable intervening event does not break the causal relationship between the defendants' actions and the plaintiffs' injuries.**" *Kelly v. M. Trigg Enterprises, Inc.*, 605 So.2d 1185, 1190 (Ala.1992).
> [P]roximate causation and whether there is an intervening cause are questions for the jury. *Liberty National Life Ins. Co. v. Weldon*, 267 Ala. 171, 189, 100 So.2d 696 (1957)." *Tuscaloosa County v. Barnett*, 562 So.2d 166, 169 (Ala.1990). (Emphasis added).

*Nelson By and Through Sanders v. Meadows*, 684 So. 2d 145, 150 (Ala. Civ. App. 1996).

Further, the Alabama Supreme Court has stated:

> In Alabama, the issue of proximate causation hinges on foreseeability and is intertwined, analytically, with the concept of intervening cause." Springer v. Jefferson County, 595 So. 2d 1381, 1384 (Ala. 1992). Indeed, this Court has stated:
>
> > [F]oreseeability is the cornerstone of proximate cause, Alabama Power Company v. Taylor, 293 Ala. 484, 306 So.2d 236 (1975). As a result, one is held legally responsible for all consequences which a prudent and experienced person, fully acquainted with all the circumstances, at the time of his negligent act, would have thought reasonably possible to follow that act, *Prescott v. Martin*, 331 So.2d 240 (Ala.1976), including the negligence of others, *Williams v. Woodman*, 424 So.2d 611 (Ala.1982). *General Motors Corp. v. Edwards*, 482 So. 2d 1176, 1194 (Ala 1985).

*Looney v. Davis*, 721 So. 2d 152, 159 (Ala. 1998).

The Fikes claim that it is “clear” both that the issue of foreseeability is the ultimate determinant in whether General Shale’s alleged negligence was the proximate cause of the Fikes’

injuries and that General Shale should have foreseen that the dangerous loads would injure someone. According to the Fikes, had General Shale performed any kind of investigation of DG Trucking before sending the kiln cars off, they would have discovered that DG Trucking had a deficient safety rating. Furthermore, the duty to safely transport the kiln cars was, the Fikes argue, non delegable. *See Brewer v. Hatcher Limousine Service, Inc.*, 708 So. 2d 163, 166 (Ala. Civ. App. 1997).

The Fikes distinguish the case at hand from that in *Pugh*, *supra*, by arguing that Peace was driving as an independent contractor for General Shale. They claim that General Shale negligently hired DG Trucking. Furthermore, according to the Fikes, as it was completely foreseeable that this accident would occur if General Shale employed DG Trucking, *General Motors Corp. v. Edwards*, *supra*, is inapplicable to this case. Neither the actions of Peace or DG Trucking can be an intervening cause when the outcome was foreseeable to General Shale.

## III. Response of Plaintiff Jerry Westbrook[5]

### A. General Shale negligently hired DG Trucking and John Peace to haul the extreme oversized load.

According to Westbrook, he has substantial evidence that General Shale was negligent in hiring DG Trucking. Westbrook notes that General Shale employed DG Trucking when it had a safety rating in excess of 80, a failing rating. He claims that General Shale cannot insulate itself from liability by hiring an independent contractor in this case. In support of this claim, he cites *Hungens v. Cook Ind. Inc.*, 521 P.2d 813 (Okla. 1973), a case with similar facts:

Where there is foreseeable risk of harm to others unless precautions are taken, it is

---

[5]As Plaintiff Westbrook's response brief in many ways mirrors that of Plaintiffs Fike, the court has condensed its summary of this argument to avoid repetition.

> the duty of one who is regularly engaged in a commercial enterprise which involves selection of motor carriers as an integral part of the business, to exercise reasonable care to select a competent carrier. Failure to exercise such care may create liability on the part of the employer for the negligence of that carrier. *Joslin v. Idaho Times Pub. Co.*, 91 P.2d at p. 388 *supra*. *See L. B. Foster Company v. Hurnblad*, 418 F.2d 727, 729, 731 (9th Cir. 1969); *National Trailer Convoy, Inc., v. Saul*, 375 P.2d at p. 923 *supra*; *Risley v. Lenwell*, 129 Cal.App.2d 608, 277 P.2d 897 (1955). If there is competent evidence tending to show that such employer knew, or in the exercise of reasonable care should have known, that the independent contractor was not such a driver, and reasonable men might draw conflicting conclusions on the matter, then whether or not the employer was negligent in the discharge of his duty to select a competent contractor becomes a question to be determined by the trier of the fact. *See National Trailer Convoy, Inc., v. Saul*, 375 P.2d at p. 929 *supra*.

*Hudgens v. Cook Industries, Inc*., 521 P.2d at 816.

Westbrook claims that Alabama law holds that even once an independent contractor is hired, if facts arise which should cause an employer to question the contractor's competence, the principal who fails to take steps to replace the contractor is then liable for the independent contractor's negligence:

> Where an owner unreservedly commissions a competent architect, pursuing an independent employment, to prepare plans and specifications for a contemplated structure, the owner may rely upon the safety, efficiency, and sufficiency of the result of the architect's labors and skill until the prudence and care attributed to the ordinarily and careful man, likewise circumstanced and informed, suggests a suspension or withdrawal of that confidence and reliance.

*Looker v. Gulf Coast Fair*, 81 So. 832, 835 (Ala. 1919).

According to Westbrook, the case of *Schramm v. Foster*, 341 F. Supp. 2d 536 (D. Md. 2004), is on point, and stated that reasonable care in selecting a carrier requires, at the minimum: (1) checking the safety statistics and evaluations of the carriers as available on the SafeStat database; and (2) maintaining internal records of the persons with whom it contracts to make sure they are not manipulating their business practices in order to avoid unsatisfactory ratings. Additionally, *Schramm* held that imposition of a common law duty to use reasonable care in selecting a carrier

is not in conflict with the FMCSR. *Id.* at 551-552.

**B. General Shale cannot delegate responsibility to DG Trucking as the hauling of the extreme wide load carried non-delegable duties imposed by law.**

Westbrook cites *General Finance Corp. v. Smith*, 505 So. 2d 1045, 1047 (Ala. 1987) for his proposition that General Shale had a non delegable duty:

> [A]n employer is responsible for the manner of the performance of certain non-delegable duties, though done by an independent contractor. An employer who by contract or law owes a specific duty to another cannot escape liability for a tortious performance by reason of the employment of an independent contractor.

**A. General Shale had a statutory duty.**

Westbrook argues that General Shale a duty to ensure the safe transit of its kiln cars under Alabama Code § 32-9-20(1), *supra*, the purpose of which, Wesbrook further argues, is to provide for the safety of the public. Westbrook quotes *Heathcock v. State*, 415 So. 2d 1198, 1203 (Ala. Crim. App. 1982):

> The obvious purposes for enacting truck weight laws is for the safety of the public, and keeping highways in good condition for the traveling public. Travel upon the highways must be as safe as it can reasonably be made consistent with their efficient use. Any overloaded truck creates a safety hazard upon the public highway as well as contributing to a bad state of repair.

According to Westbrook, as General Shale decided to haul these kiln cars, and actually loaded them onto the truck, they are ultimately responsible for the outcome. Westbrook quotes:

> An exception...obtains where a duty to the public exists in the manner of executing the work undertaken by the contractor. Such duty exists when the execution of the work tends to create a nuisance; when it is dangerous within itself, as in blasting operations; when the work requires the creation of dangerous conditions, such as ditches and the like in a public highway; or generally when the maintenance of safe conditions in connection with the work is essential to protection of the public. In such a case the chief contractor cannot transfer his public duty to a subcontractor. If the contractor places the performance of such duty in the hands of another, to that extent, that other is in law the mere agent, and the contractor is liable for his

negligence.

*Williams v. Tennessee River Pulp and Paper Co.*, 442 So. 2d 20, 23 n.2 (Ala. 1983).

Westbrook claims that the width and mass of this particular load created an unusual hazard. Accordingly, Westbrook argues, the maintenance of safe conditions incident to the transportation of the kiln cars was absolutely necessary to the protection of the public. Westbrook claims that *General Finance Corp. v. Smith*, 505 So. 2d 1045 (Ala. 1974) is analogous to the present case. In *General Finance Corp.*, the court held that Alabama Code § 7-9-502 required that a creditor's right to repossession without judicial process be accomplished without breach of the peace; it was irrelevant whether the creditor hired an independent contractor to do the actual repossession. Westbrook argues: "although General Shale was free to contract with DG Trucking to haul the oversize load, it cannot escape liability for their legal breach of Alabama Code § 29-9-20. This is especially true where General Shale actually loaded the illegal load, and so participated directly in the violation."

**C. General Shale is liable for the negligence of DG Trucking as the hauling of the extreme wide load was an intrinsically dangerous activity.**

Westbrook claims that the "intrinsically dangerous activity" exception to the general rule of insulation from liability articulated in the Restatement (Second) of Torts § 416 (1965) (*see supra*) has been "well-founded" in Alabama law. *See Boroughs v. Joiner*, 337 So. 2d 340, 342 (Ala. 1976); *Robertson v. City of Tuscaloosa*, 413 So. 2d 1064, 1066 (Ala. 1982); *Bacon v. Dixie Bronze Co., Inc.*, 475 So. 2d 1177, 1181 (Ala. 1985); *Jones v. Power Cleaning Contractors*, 551 So. 2d 996, 999 (Ala. 1989); *Borden v. Consumer Warehouse Foods, Inc.*, 601 So. 2d 976, 978-979 (Ala. 1992). Westbrook asserts that General Shale's own expert admitted that transporting the kiln cars was an intrinsically dangerous activity:

Q: Okay. Considering the size of the load and the weight of the load and your experience in the transportation industry, would you classify the hauling this load through three states as a dangerous activity?
A: Actually, its four states. But all trucking is a dangerous activity.
Q: I didn't ask you that. I asked you about this load.
A: Well, this is part of all trucking. I would say yes, it's dangerous.
Q: It's a dangerous activity?
A: Yes it is.
Q: And considering what you know about this load, would you say its an intrinsically dangerous activity?
A: Are you asking is this more dangerous than the typical load; is that the --
Q: Yes
A: – context? Yes. I would say yes.

T. Morgan depo. at pp. 86-87.

Westbrook argues that the size and weight of this load made its transportation an intrinsically dangerous activity; therefore, General Shale cannot be shielded from liability for whatever harm that transportation caused.

**D. Intervening Cause is not a valid defense, as the crash was foreseeable.**

As the Fikes did, Westbrook asserts that it is generally accepted that the question of proximate cause is almost always reserved for a jury. *Marshall County v. Uptain*, 409 So. 2d 423, 425 (Ala. 1981); *Lawson v. General Telephone Co. of Alabama*, 267 So. 2d 132 (Ala. 1972). Westbrook claims that "the question of must go to the jury if reasonable inferences from the evidence support the theory of the complaint." *Marshall County*, 409 So. 2d at 425. Westbrook notes that the complaint clearly alleges that General Shale's selection of DG Trucking, along with General Shale's lack of safety training, was a proximate cause of the accident.

Westbrook claims that a principal is not immune to liability of the ultimate accident is foreseeable. *Black Belt Wood, Inc. v. Sessions*, 514 So. 2d 1249, 1251-1252 (Ala. 1986); *see also Alabama Power Co. v. Guy*, 206 So. 2d 594 (Ala. 1967). According to Westbrook, General Shale

should have foreseen the consequences of using a contractor with deficient safety ratings and a truck with obvious safety violations.

**E. Defendants wrongly represent [that] plaintiffs' expert's opinions based on his experience and specialized knowledge are speculation, and further misrepresent material issues of fact in attacking him.**

According to Westbrook, Whitney Morgan is amply qualified as an expert in the motor carrier field. He asserts that General Shale's argument that the truck and trailer may not have been in the same condition at the site of the accident as it was when it left their plant some 400 miles away has been squarely refuted by W. Morgan's testimony. Westbrook claims that this testimony is not improper speculation, but rather proper for W. Morgan to testify to. Westbrook cites DG Trucking's failing safety rates and the failure of General Shale employees to either receive safety training or recognize the enumerative deficiencies present on the trailer at the time of loading as evidence to support W. Morgan's opinion that the state of the truck was substantially unchanged between leaving the General Shale plant and the accident. Further, according to Westbrook, it is the opinion of W. Morgan that General Shale's turning of a blind eye to DG Trucking's safety violations constituted an aiding and abetting violation of FMCSR § 390.13, *supra*.

**F. Substantial evidence exists that General Shale negligently entrusted the load to DG Trucking and John Peace**.

Westbrook claims that, although General Shale did not argue against plaintiffs' negligent entrustment claims in their brief in support of summary judgment, substantial evidence of that claim exists. According to Westbrook, "the essential ingredients of a cause of action for negligent entrustment are: (1) an entrustment; (2) to an incompetent; (3) with knowledge that he

is incompetent; (4) proximate cause; and (5) damages." *Edwards v. Valentine*, 2005 Ala. LEXIS 174 at *3. The Restatement (Second) of Torts § 390 states that:

> one who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

This view has been adopted by Alabama. *See Keller v. Kiedinger*, 398 So. 2d 129, 132 (Ala. 1980). Westbrook argues that, due to the deficient safety rating of DG Trucking, and the control which General Shale had over the load initially, genuine issues of fact exist as to General Shale's allegedly negligent entrustment of the load that struck the plaintiffs.

## V. General Shale's Reply

### A. General Shale had no obligation or duty to inspect the DG Trucking equipment.

According to General Shale, Alabama Code § 32-9-20 imposed no duty upon General Shale to inspect DG Trucking's equipment. General Shale cites *Williams v. Tennessee River Pulp & Paper Co.*, 442 So. 2d 20 (Ala. 1983) for its assertion that a shipper does not have a duty to inspect the equipment used by an independent carrier. In *Williams*, the plaintiff's decedents were killed when a wheel came off a tractor trailer hauling longs and struck their vehicle. The defendant had hired the carrier involved in the accident to haul the defendant's logs from its property to its lumber mill. General Shale claims that the trucking company provided the equipment and the driver. General Shale asserts that it was shown that the tractor trailer had been negligently maintained, and this was the proximate cause of the accident, and not the loading of the trailer. The Alabama Supreme Court held that the defendant was "not responsible for the

independent contractor's compliance with simple maintenance procedures and load factors." *Id.* at 23. The Court also cited Comment d. to Section 416 of the Restatement of Agency, which states that "the employer is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit..." *Id.*

General Shale also argues that the plaintiffs' reliance on General Shale's status as a carrier is misguided. General Shale claims that the federal regulations require them to be familiar with those regulations "applicable to that motor carrier's operations." 49 C.F.R. § 390.3(e)(1). Since General Shale was unable to transport the kiln cars itself, it hired DG Trucking, and was not required to be familiar with any regulations applicable to the hauling of over-dimensional freight.

**B. This case does not involve an inherently dangerous activity or an activity that constitutes a peculiar risk of harm.**

General Shale begins by claiming that it is the Restatement (Second) of Agency, misidentified as the Restatement (Second) of Torts by the plaintiffs, which is most pertinent to this case.[6] According to General Shale, the Alabama Supreme Court recently addressed the issue of what constitutes an intrinsically dangerous activity in *Stovall v. Universal Construction Co., Inc.*, 893 So. 2d 1090 (Ala. 2004). In *Stovall*, the court explained that work is intrinsically dangerous if the "risk posed by such activity inheres in the performance of the contract and results *directly* from the work to be done, *not* from the collateral negligence of the contractor." *Id.* at 1099 (emphasis in original). The *Stovall* court specifically found only three examples

[6] This assertion by General Shale is incorrect. The Restatement section upon and about which all parties are relying and arguing is, in fact, the Restatement (Second) of Torts § 416 (1965).

where certain actions have been found to constitute intrinsically dangerous activities: 1) the application of highly caustic paint remover; 2) the aerial spraying of pesticides; and 3) the use of dynamite. *Id*. General Shale argues that the risk to the public and this accident arose from DG Trucking's inadequate safety and maintenance program and John Peace's negligent operation of the tractor trailer with faulty brakes, and not from simply hauling an oversize load. General Shale quotes the Alabama Supreme Court:

> Tennessee Paper may be responsible for special precautions to anchor a load of giant trees which constitute a peculiar risk, but it is not responsible for the independent contractor's compliance with simple maintenance procedures and load factors.

*Williams v. Tennessee Pulp and Paper Co.*, 442 So.2d at 23.

By way of analogy, General Shale claims that its duties ran only so far as securing the load of kiln cars. Furthermore, General Shales asserts that it had no control over the route selected by DG Trucking, and that routing instructions were part of the permit acquired by DG Trucking, though that permit expired one day before the shipping of the load which resulted in this accident.

**C. There is no evidence in this case that the kiln cars were improperly loaded, or that the manner in which the kiln cars were loaded had anything to do with the accident at issue.**

According to General Shale, the Traffic Homicide Report written by the Alabama State Troopers does not identify a single problem or impropriety with the manner in which the kiln cars were loaded and secured on the tractor trailer. There is no mention of the load shifting, but rather the report identifies brake failure as the cause of the accident. General Shale asserts that when Whitney Morgan was asked whether there was any problem with the loading/securing of the kiln cars, he testified "nothing that I'm aware of." Morgan depo. at pp. 266-267. General

Shale argues that neither *Black Belt*, *supra*, and *Birmingham Slag*, *supra*, cases cited by the plaintiffs, support the claim that General Shale negligently loaded the tractor trailer in this case.

General Shale claims that the plaintiffs' claims that the load was illegal as both overwide and overweight in violation of § 32-9-20 are incorrect. First, General Shale notes that the plaintiffs' argument that the load was over weight limitations is based on the assumption that this tractor trailer had four axles. General Shale claims that the tractor trailer had **seven** axles, meaning that the maximum weight carried by any one axle was only 14,850 pounds, well below the 20,000 pounds-per-axle limit. *See* Vehicle Weight Report. Second, General Shale asserts that § 32-9-29 provides for permitting of loads that otherwise violate the width requirements of § 32-9-20. According to General Shale, DG Trucking obtained such a permit. General Shale claims that the plaintiffs contend that the kiln cars were loaded before July 14, 2003, and that DG Trucking's permit was valid until July 13, 2003. It is the contention of General Shale that DG Trucking had the obligation to obtain the proper permits.

**D. The undisputed evidence establishes that the accident in this case was caused solely by John Peace's improper operation of the tractor trailer.**

According to General Shale, the Alabama Supreme Court's decision in *Pugh v. Taylor*, 507 So. 2d 428 (Ala. 1987), is squarely applicable to this case. In that case, even though the defendant did not use the appropriate warning devices or obtain a proper permit for hauling an oversized the load, the court found that those failures were not the proximate cause of the accident. In *Pugh*, the court found that the plaintiff's brake failure was the proximate cause of the accident. General Shale claims that, in this case, like in *Pugh*, it was brake failure that caused the accident, and the absence of a permit and proper warning lights was not the proximate cause.

**E. General Shale acted appropriately in hiring DG Trucking.**

General Shale characterizes the plaintiffs' statements that General Shale simply "assumed" that DG Trucking was competent as "incorrect." General Shale notes that it has a long-standing (approximately fifteen years) relationship with DG Trucking, and had never had any problem before. General Shale asserts that DG Trucking is bonded and regulated by the State of Alabama, and that Peace had a valid commercial driver's license (CDL) at the time of the accident. Even though Peace had two speeding violations and failed to maintain liability insurance on one occasion, General Shale claims that this is not evidence that Peace was a negligent driver; federal regulations provide extensive requirements for carriers concerning the hiring and training of commercial drivers. 49 C.F.R. § 390 *et seq*. General Shale further asserts that a copy of the most recent safety report lists DG Trucking safety rating as "satisfactory." Though they are now attempting to submit an affidavit from Whitney Morgan labeling DG Trucking as a negligent carrier[7], General Shale notes that at the time of the initial briefing, the plaintiffs were unable to identify any evidence of DG Trucking safety record at the time they were hired by General Shale.

General Shale argues that *Schramm*, *supra*, a case relied upon by the plaintiffs, is easily distinguished from this case. According to General Shale, "[t]he crucial finding in by the Court in *Schramm* was that the defendant was a very large freight broker which held itself out as a 'one point of contact' service to shippers." General Shale claims that it is not as sophisticated as a freight broker, and it does not hold itself out as such. Therefore, General Shale asserts that

---

[7]This affidavit is subject to a Motion to Strike filed by General Shale on November 10, 2005. This court has not yet addressed that Motion.

*Schramm* has no bearing on this case.

**F. General Shale did not aid or abet DG Trucking in violating the Federal Regulations.**

General Shale claims that the plaintiffs' assertion that, since General Shale has DOT authority to act as a carrier, it and its employees must be familiar with all federal regulations pertaining to carriers, is incorrect. According to General Shale, the regulations require only that "[e]very employer shall be knowledgeable of and comply with all regulations contained in this subchapter which are applicable to that motor carrier's operations." General Shale argues that the load of kiln cars was too big for it to transport, so it hired DG Trucking, a firm with experience in this endeavor. General Shale asserts that the plaintiffs would have to show that General Shale aided, abetted, encouraged, or required DG Trucking to violate the federal regulations in order to succeed on this claim. There is no evidence to support this allegation, General Shale claims.

**VI. The Sur-Reply of Plaintiffs Fike.**

On November 17, 2005, the Fike plaintiffs filed a Motion for Leave to File Response to Defendants' Reply Brief in Support of Motion for Summary Judgment, in which those plaintiffs alleged General Shale mischaracterized the law and both misrepresented and mischaracterized certain facts in its response brief. On November 18, 2005, this court granted the Fike plaintiffs' Motion. The Fikes never filed their sur-reply brief. On March 3, 2006, General Shale filed a brief in further support of its own Motion for Summary Judgment, the crux of which is that the Fikes never supported their arguments that General Shale had mischaracterized and/or misrepresented either law or fact in its reply brief.

**CONCLUSIONS OF THE COURT**

This is somewhat typical of questionable cases against target defendants based upon scattergun theories. Some of the theories are less valid than others. All may be invalid. The court will address each one seriatim without repeating the above stated facts and arguments.

**I. Loading**

Apparently General Shale loaded the equipment, and if there were any substantial evidence that its loading was done negligently and was the cause of the accident, it could be held liable on this theory. There is, however, no substantial evidence that the loading per se was improper, nor that it was a cause of the accident. Any claim(s) based on this theory will be dismissed.

**II. Permit and Escort Vehicles**

There is no basis for a determination of liability of General Shale based on issues relating to DG Trucking's permit or the number of escort vehicles. Even assuming that General Shale had any responsibility regarding the permit or the number of escort vehicles, there is no substantive evidence that matters related to these matters proximately caused the accident. Any such claims will be dismissed.

**III. Aiding and Abetting**

The court deems this claim to be frivolous and will dismiss it.

**IV. Other Claims**

The court finds no basis for any other direct claims against General Shale.

**V. Liability for Negligence of Independent Contractor**

The evidence is overwhelming that the accident was caused by DG Trucking and its driver either because of improper maintenance of the truck or improper operation of the truck or

both. Further, there is no dispute that DG Trucking was an independent contractor of General Shale. Further, the negligence of DG Trucking and Peace was an intervening cause as it may relate to any even arguable initial negligence of General Shale. Further, there is no dispute that DG Trucking was an independent contractor of General Shale.

The only remaining issues are:

(1) Under Alabama law does the mere contracting for the hauling of an oversize load make the shipper vicariously liable for the negligence of the independent contractor trucking company?

(2) If there is some general liability for negligence of an independent contractor merely because of the oversize load, does the liability of the shipper extend to causes unrelated to the oversize load per se, such as improper brakes or driving?

The court will certify these questions to the Supreme Court of Alabama.

This 29th day of June, 2006.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**